# Exhibit "B"

DAVID S. SENOFF, ESQ. (No. 65278)
HILLARY B. WEINSTEIN, ESQ. (No. 209533)
**FIRST LAW STRATEGY GROUP, LLC**
121 S. BROAD STREET, SUITE 300
PHILADELPHIA, PA 19107
PHONE: (215) 258-4700
FAX: (215) 258-4777
DSENOFF@FIRSTLAWSTRATEGY.COM
HWEINSTEIN@FIRSTLAWSTRATEGY.COM                    *ATTORNEYS FOR PLAINTIFF*

*Filed and Attested by the
Office of Judicial Records
20 OCT 2020 12:45 pm
S. RICE*

| | | |
|---|---|---|
| STANLEY GOLDFARB, M.D. | : | |
| | : | COURT OF COMMON PLEAS |
| PLAINTIFF, | : | PHILADELPHIA COUNTY |
| | : | |
| V. | : | CIVIL ACTION |
| | : | COMPLAINT |
| | : | |
| | : | MAY TERM, 2020 |
| HARRISON A. KALODIMOS, M.D. | : | No.  001785 |
| | : | |
| DEFENDANT. | : | MAJOR NON-JURY |

### NOTICE TO PLEAD

| **NOTICE** | **AVISO** |
|---|---|
| You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u ostros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. <u>THIS OFFICE CAN PROVIDE YOU WITH</u> | LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE.    SI    NO    TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, |

<u>INFORMATION ABOUT HIRING A LAWYER.</u>

<u>IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.</u>

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION
SERVICE
1101 Market Street
Philadelphia, Pennsylvania 19107
Telephone:  215-238-6300

VAYA EN PERSONA O LLAME FOR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE
FILADELFIA
SERVICIO DE REFERENCIA E
INFORMACION LEGAL
1101 Market Street
Filadelfia, Pennsylvania  19107
Telefono:  215-238-6300

DAVID S. SENOFF, ESQ. (NO. 65278)
HILLARY B. WEINSTEIN, ESQ. (NO. 209533)
**FIRST LAW STRATEGY GROUP, LLC**
121 S. BROAD STREET, SUITE 300
PHILADELPHIA, PA 19107
PHONE: (215) 258-4700
FAX: (215) 258-4777
DSENOFF@FIRSTLAWSTRATEGY.COM
HWEINSTEIN@FIRSTLAWSTRATEGY.COM          *ATTORNEYS FOR PLAINTIFF*

| | | |
|---|---|---|
| STANLEY GOLDFARB, M.D. | : | |
| | : | COURT OF COMMON PLEAS |
| PLAINTIFF, | : | PHILADELPHIA COUNTY |
| | : | |
| V. | : | CIVIL ACTION |
| | : | COMPLAINT |
| | : | |
| | : | MAY TERM, 2020 |
| HARRISON A. KALODIMOS, M.D. | : | No. 001785 |
| | : | |
| DEFENDANT. | : | MAJOR NON-JURY |

## COMPLAINT

Plaintiff Stanley Goldfarb, M.D. ("Plaintiff" or "Dr. Goldfarb"), by his attorney, for his

complaint against Defendant Harrison Kalodimos, M.D. ("Defendant" or "Dr. Kalodimos"), alleges

as follows:

## STATEMENT OF CASE

1.       This is an action for recovery of damages and injunctive relief arising from blatant

acts of defamation, libel, and false light invasion of privacy, in connection with the Defendant's

persistent publishing of false and harmful information regarding Plaintiff.

2.       Defendant caused to be published certain false and defamatory statements about

Plaintiff Dr. Goldfarb on Twitter following Dr. Goldfarb's September 2019 publication of an Op-Ed

article regarding the current state of medical school curriculum in the Wall Street Journal.

3.       Although Dr. Goldfarb was prepared for discussion and even disagreement over the

views he expressed in his Op-Ed, what he was decidedly *not* prepared for was the false and injurious

statements regarding his character, from a lecture he had given regarding the University of Pennsylvania's Perelman School of Medicine's accreditation process years prior.

4.      Upon information and belief, and judging by the hundreds of "likes" on Defendant's Twitter posts, the defamatory statements were viewed by hundreds, if not thousands, of people.

5.      As a result of these written defamatory statements, Dr. Goldfarb continues to feel the damaging effects of Defendant's false and harmful statements, as he continues to receive hate mail and email, damaging Twitter and other social media posts, and false articles published on his alleged "actions" and regarding his character.

6.      In other words, as a result of Defendant's written defamatory statements, Plaintiff has, and continues to be, substantially and irreparably harmed.

## PARTIES

7.      Plaintiff Stanley Goldfarb, M.D., is a Professor of Medicine and former Associate Dean of Curriculum at the University of Pennsylvania's Perelman School of Medicine.  Dr. Goldfarb is also a physician at the Hospital of the University of Pennsylvania, in the Renal-Electrolyte and Hypertension Division (Nephrology) Department.

8.      Upon information and belief, Defendant Harrison Kalodimos, MD is a physician of family medicine at the Swedish Medical Center located in Seattle, Washington.

9.      Upon information and belief, from 2012-2016 Dr. Kalodimos was a student at the Perelman School of Medicine at the University of Pennsylvania.

10.      It is unknown at this time whether Dr. Kalodimos was ever a student in Dr. Goldfarb's classes.  It is similarly unknown at this time whether Dr. Kalodimos was present at the February 2016 lecture described more fully below.

Case ID: 200501785

## JURISDICTION AND VENUE

11.     This action has been commenced within the original subject matter jurisdiction of the Court of Common Pleas pursuant to 42 P.S. § 931.

12.     This Court has personal jurisdiction over Defendant because the Defendant here is alleged to have committed intentional torts, the Plaintiff felt the brunt of the harm in Pennsylvania, and the Defendant expressly aimed his tortious conduct at Pennsylvania such that Pennsylvania can be said to be the focal point of the resulting harm to Plaintiff; therefore, personal jurisdiction is properly exercised over Defendants.

13.     Venue is proper in this Court pursuant to Pa. R. Civ. P. 1006 as it is a county in which the cause of action arose or where a transaction or occurrence took place out of which the cause of action arose.

## FACTUAL BACKGROUND

### February 22, 2016 Lecture with Penn Medicine Graduating Class

14.     On February 22, 2016, Dr. Stanley Goldfarb, Professor of Medicine at the University of Pennsylvania Perelman School of Medicine (and, at the time, the Associate Dean of Curriculum at the same) spoke to one of the graduating classes regarding the University of Pennsylvania's Perelman School of Medicine's (the "Medical School") recent Liaison Committee on Medical Education (LCME)[1] accreditation review and its relationship to the University's upcoming "graduation questionnaire."

15.     The entire lecture was recorded, and a true and correct copy can be found and downloaded at the link in the footnote[2], referenced hereafter as Exhibit "A."

---

[1] The LCME is an accrediting body for medical educational programs leading to an MD degree in the United States and Canada.

[2] https://firstlawstrategy-my.sharepoint.com/:f:/p/cmcnally/Ei0IqF2SkQlPhYDegfgW9PAB7Dj5rcHMzTANBo8yY7m7ow?e=hBeTn6

3

Case ID: 200501785

16.     During that class, Dr. Goldfarb congratulated the class for almost finishing and their approaching "Match Day."[3]  *Id.* at 0:13-40.

17.     He then stated that he wanted to discuss the upcoming "graduation questionnaire" and give the students an idea of how that questionnaire would be used.  *Id.* at 0:41-55.

18.     Dr. Goldfarb discussed the recent completion of the LCME review, which Dr. Goldfarb described as a "very, very successful effort," noting that the University of Pennsylvania had been reviewed "very, very favorably."  *Id.* at 0:55-1:17.  Dr. Goldfarb described how there were about 190 standards that the Medical School was supposed to meet and that the Medical School "met all but two" of those standards.  *Id.* at 1:17-1:23.

19.     One of these sub-par standards was the use of the library, and the second standard involved a question about whether anyone had been discriminated against, to which "a bunch of people wrote in that they had been discriminated against."  *Id.* at 1:24-1:52.

20.     Dr. Goldfarb went on to say that the way the LCME asked the Medical School to frame this "gave a distorted view of how frequently this happened," and the other thing that "gave a very distorted view was the interpretation of what the word discrimination means."  *Id.* at 1:56-2:12.  As an example, Dr. Goldfarb stated that he could "insult everyone in this room right now" (to which many of the students laughed), "and I would have insulted all of you, but I would not have discriminated."  *Id.* at 2:13- 2:23.  "Discrimination," Goldfarb went on to explain calmly, "is not insulting."  He continued:

> Discrimination is actually doing something horrible that prevents you from getting something that's rightfully yours, treating you in a way that prevents you from having something happen.  **Now, people say a lot of stupid things that you've encountered in the wards, and maybe even in lectures.  Things that people shouldn't have been said, things that were uncivil, things that made you uncomfortable, none of those things should happen.  But they really aren't discrimination.**  So we have to go through a discussion with [LCME] about exactly

---

[3] "Match Day" represents the day when the National Resident Matching Program releases results to applicants seeking medical residency and fellowship training positions in the United States.

Case ID: 200501785

what people meant. **It was much more about uncivil and thoughtless and stupid and ridiculous and ignorant sort of statements. It sounded like a presidential campaign [laughs] more than anything else.** So, uh, so words are very important. So we'll respond and show the LCME the data that we have and make the point that this represented uncivil behavior rather than true discrimination, preventing people. **Maybe there were episodes of discrimination but not nearly the frequency that was implied by this.**

*Id.* at 2:26-3:30 (emphasis added).

21.     Dr. Goldfarb went on to explain that the graduation questionnaire the students are to fill out will be "the source of information that's going to be important for us in future reviews by the accrediting body. They're [LCME] going to look at the graduation questionnaire as they looked at the one that preceded you all to say, 'what are you doing about this problem?' So we need to know what the problems really are, and we need to know, um… we need to have you think carefully about the things that you've experienced so that we get the right information back to us. **We want honesty above all else. We want you tell us exactly about what you think, but we want you to think hard about what exactly is being asked.**" *Id.* at 3:37-4:10 (emphasis added).

22.     Dr. Goldfarb illustrated the difficulty of assessing the questionnaire because it itself was generic, meant to apply to "all the [medical] schools in the country" despite the fact that all medical schools are not organized in the way that Penn is organized. For instance, Penn integrates pharmacology and physiology lectures throughout its coursework, as opposed to other schools that have separate courses for those subjects. Therefore, in responding to a question regarding what students thought of those courses, if students responded that they didn't have *any* specific pharmacology or physiology courses, this could be misleading to the LCME. *Id.* at 4:10-5:39.

23.     Dr. Goldfarb then implored students to be just as thoughtful in responding to questions regarding "mistreatment":

The final thing that comes up and this is the one thing that we worry about very much, is this idea of 'mistreatment.' Now, mistreatment definitely goes on, and it goes on in all sorts of modes: it often goes on between classmates, which we've heard; it goes on between residents and students, and it goes on between faculty and residents, and

5

Case ID: 200501785

sometimes faculty and students.  We'd love it to be zero, it's never going to be zero. **But on the other hand, we need to have a really thoughtful sense of it because if we're seen as having a tremendous problem in this area, well then we got to rip up what we do now and change things.  And if we do have a tremendous problem in this area, that's what we should do.  On the other hand, if we don't, then we need to just make sure that our current systems work well.**  So when you talk about, when they talk about 'mistreatment,' when they talk about that, understand that we have policies here that we've illustrated to you on several occasions: the safe learning environment policy is a mistreatment policy, it's another name for it.  **We expect that when people are mistreated that we find out about it.**  Our current policy, by the way, which we've changed in the last few years, is that anybody who feels that something has happened that makes them uncomfortable, particularly in the clinical arena, they go to Barb Wagner, instead of going to course directors or faculty on the course, because a lot of people are concerned that if they complain about something it's going to influence their grades.  **So we've tried to take it away from the course directors, and part of that change has been a result of information we've gotten from those graduation questionnaires.  So getting this information is really incredibly important and helpful to us.**

*Id.* at 7:08-8:50 (emphasis added).

24.     At the end of his lecture, Dr. Goldfarb acknowledged that the graduation questionnaire was "very long and painful," but that "paying attention to it is enormously useful" because "it gives [the Medical School administration] this true picture of the school, and it's enormously useful because your strong efforts in it are going to be the basis for the next review that we're going to have in several years.  **Fortunately, we're not going to have another review for eight years, but we want to now this information to improve things for the classes that are coming down the pike, if improvements need to be made.**"  *Id.* 10:00-10:28 (emphasis added).

25.     Dr. Goldfarb also acknowledged that the Medical School wanted to make sure it was not an outlier in any areas: **"So we want to hear the good things, we want to hear the bad things.**  And we want you to just take it very seriously and carefully because it will influence how students in future years are treated here and the opportunities that they have here."  *Id.* at 11:33-11:45.  "**So, take it seriously.  That's really the message we have here.  It really, really is important that you do it in a really thoughtful way**."  *Id.* at 12:05-12:11 (emphasis added).

6

Case ID: 200501785

26.     Multiple times throughout his lecture, Dr. Goldfarb paused to ask for questions and comments from students and his teaching assistants. *Id.* at 5:38; 10:29; 12:20.

### September 12, 2019 Wall Street Journal Article

27.     **Three years** following that lecture with the Penn graduating class, and **unrelated in any way to that lecture**, Dr. Goldfarb wrote an Op-Ed that was published the Wall Street Journal ("WSJ") on September 12, 2019, entitled "Take Two Aspirin and Call Me by My Pronouns."  In that Op-Ed, Dr. Goldfarb wrote generally about the increase in medical schools in teaching "social justice" curriculum; and while he thoroughly recognized that the goals of eliminating health disparities were "worthwhile goals," he opined that the teaching of these issues was "coming at the expense of rigorous training in medical science."  *See* Stanley Goldfarb, "Take Two Aspirin and Call Me by My Pronouns," (Sept. 12, 2019), a true and correct copy of which is attached hereto as Exhibit "B."[4]

28.     Dr. Goldfarb expected a discussion and even a certain amount of controversy to follow the publication of his Op-Ed article.

29.     However, a few days following the publication of that September 12, 2019 Op-Ed, Dr. Kalodimos, now a primary care physician located in Seattle, Washington, took to Twitter to (falsely) announce that "When the LCME (med school accreditation body) found that Penn Med had disproportionately high rates of sexual and racial harassment, Stan Goldfarb (the author) called a class meeting where he berated our class for talking candidly about these experiences."  *See* September 15, 2019 Kalodimos tweets, a true and correct copy of which is attached hereto as Exhibit "C."

30.     Kalodimos also pinned a link to Dr. Goldfarb's September 12, 2019 Op-Ed to that tweet. *Id.*

---

[4] It should be noted that, pursuant to the WSJ's policy, Dr. Goldfarb was not the author of the "headline" or the "title" of the Op-Ed.

Case ID: 200501785

31.     Following the first "tweet," Dr. Kalodimos published a second "tweet" on that same day (Sept. 15, 2019) stating (falsely): "His message to us was that **we were too sensitive for reporting sexual harassment to the LCME and we should lie about these experiences to the accreditation**. [sic] **Body because it would hurt Penn's reputation**." *Id.* (emphasis added).

32.     Dr. Kalodimos's third "tweet" on that day read: "That same year, they had to shut down a rotation because the doctor I [sic] charge of the rotation kept inappropriately touching female medical students.  They didn't fire the doctor, they just tried to limit his exposure to medical students." *Id.*

33.     If those three "tweets" were insufficient to defame Dr. Goldfarb, Dr. Kalodimos's final "tweet" on that day (Sept. 15, 2019) ensured that there could be no doubt about Dr. Kalodimos's intent to harm and defame Dr. Goldfarb when he (falsely) stated as fact that: "**I'm glad that Goldfarb was finally forced out of Penn, but he is part of a noxious group of physicians who seek to hide abuse and protect abusers.  This commentary is completely in line with who he is as a human being.** H/t @MaraGordonMD for the link." *Id.*  (emphasis added).

**April 13, 2020 Wall Street Journal Article**

34.     On April 13, 2020, Dr. Goldfarb wrote another Op-Ed that was published in the WSJ entitled "Med School Needs an Overhaul." *See* Goldfarb, S. "Med School Needs an Overhaul" (Apr. 13, 2020), a true and correct copy of which is attached hereto as Exhibit "D."[5]

35.     In that article, Dr. Goldfarb opined that, generally, most American medical schools do not require students to do coursework on pandemic response or practical preparation for a widespread and sustained emergency, and that American medical training, as a whole, does not include a strong grounding in public-health issues or disaster preparedness.  Dr. Goldfarb advocated that curricular

---

[5] *See* note 4, *supra*, regarding the WSJ's authorship of the title and heading of the Op-Ed.

Case ID: 200501785

requirements be revised to lessen the focus on social issues in medicine, such as "poverty, food insecurity and racism" and instead strengthen its pandemic preparedness. *Id.*

36.     A day later, on April 14, 2020, Dr. Kalodimos once again took to Twitter to (falsely) state that: "It looks like Stan Goldfarb in [sic] back in the WJ, aghast that my generation of physicians cares about health equity and social determinants of health. **As a reminder, Goldfarb actively tried to suppress reporting of sexual and racial harassment at @PennMedicine**." *See* April 14, 2020 Kalodimos tweet, a true and correct copy of which is attached hereto as Exhibit "E." (emphasis added).

37.     As is obvious from the lengthy excerpts reproduced, *supra,* from the Goldfarb February 22, 2016 transcript, Dr. Kalodimos's above statements are knowingly and materially false, and were clearly made to defame Plaintiff.

38.     First, Dr. Goldfarb did not "berate" the class, but rather engaged the class in a calm discussion.  This is obvious from the tone of the actual recording.  *See* Exhibit A.

39.     In addition, the lecture was interactive, as Dr. Goldfarb called on his teaching assistant for additional comments, and the class for its comments or questions multiple times during his lecture. *Id.*

40.     Second, Dr. Goldfarb never stated that the graduating class was "too sensitive," and he never made any mention of reporting of "sexual harassment" or "racial discrimination"; nor that any students should "lie" in their questionnaire answers.  *See* Exhibit A.  Instead, he simply reiterated the need for students to take such a generic questionnaire seriously and review it carefully for what it was actually asking, emphasizing many times the need for students to report their experiences with honesty. *Id.*

41.     Third, Dr. Kalodimos's tying of the unfortunate harassment incident to Dr. Goldfarb, and his insinuation that Dr. Goldfarb was "part of a noxious group of physicians that seek to hide

9

Case ID: 200501785

abuse and protect abusers" was not only false, and designed to harm Dr. Goldfarb, but also imputed criminal behavior to Dr. Goldfarb which had no foundation in reality.  In short, Dr. Kalodimos's written statements on Twitter bore no relationship to the truth.  *See* Exhibits C and E.

42.    The September 2019 statements were written in such a way that no reasonable person would believe that the statements made therein were mere opinion, but rather statements of facts about Plaintiff.

43.    Finally, despite the absence of a relationship between Dr. Goldfarb's February 22, 2016 lecture and the April 2020 WSJ Op-Ed, Dr. Kalodimos wrote on Twitter: "**As a reminder**, Goldfarb actively tried to suppress reporting of sexual and racial harassment at @PennMedicine."  *See* Exhibit E (emphasis added).  Again, this statement was not only knowingly and materially false and made to defame Plaintiff, but it again imputed criminal behavior to Dr. Goldfarb, and (wrongly) referenced improper conduct bearing on Dr. Goldfarb's profession as a professor and (former) administrator at Penn Medical School.

44.    The April 2020 statements were also written in such a way that no reasonable person would believe that the statements made therein were mere opinion, but rather statements of facts about Plaintiff.

## COUNT I: DEFAMATION PER SE AND LIBEL

45.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 44 as though fully set forth here.

46.    Defendant has intentionally made knowingly false written statements of fact about Plaintiff through his September 2019 and April 2020 Twitter postings.

47.    The aforementioned written statements were false when made and Defendant knew or should have known that these written statements were false when made.

10

Case ID: 200501785

48.     These written statements were false and were published to third parties in this Commonwealth and this county, and, in fact, around the world through Defendant's use of the Twitter platform and the Internet.

49.     These written statements were made maliciously and willfully and were intended to cause harm to Plaintiff's personal and professional reputation.

50.     The written statements were made with reckless disregard for their truth or falsity or with knowledge of their falsity and with wanton and willful disregard for the reputation and rights of the Plaintiff.

51.     The aforementioned written statements were made of, and concern, Plaintiff and were so understood by those who read Defendant's publication of them.

52.     Among other written statements, Defendant falsely accused Plaintiff of: actively trying to "suppress reporting of sexual and racial harassment at Penn Medical School," "berat[ing] the class for talking candidly about these experiences," telling the class that they "were too sensitive for reporting sexual harassment to the LCME and we should lie about these experiences to the accreditation… Body because it would hurt Penn's reputation" and that Dr. Goldfarb was part of a "noxious group" of physicians who want to "hide abuse and protect abusers," and more.

53.     Defendant's false written statements of fact injured Plaintiff in his business trade and/or profession.

54.     In addition, Defendant's false statements imputed criminal behavior to Plaintiff.

55.     As a result of Defendant's acts, Plaintiff has suffered irreparable damage to his reputation, as well as embarrassment and humiliation.

56.     As a result of the willful and malicious nature of the defamation, Plaintiff is entitled to punitive damages.

Case ID: 200501785

## COUNT II: FALSE LIGHT INVASION OF PRIVACY

57.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 44 as though fully set forth here.

58.    Both the September 2019 and April 2020 Twitter posts invaded Plaintiff's privacy by publicly placing him in a false light.

59.    The published written statements, viewed by at least hundreds, if not thousands, of people, indicated that Dr. Goldfarb was unprofessional, a liar, and that he was shielding the University of Pennsylvania from accusations of sexual harassment and racial discrimination, all of which is untrue and would be highly offensive to a reasonable person.

60.    Defendant had knowledge of and/or acted in reckless disregard for, the falsity of his publication and the false light in which the Twitter postings placed Dr. Goldfarb.

61.    Plaintiff found these statements to be highly offensive and because they were false and unfair, and did not wish for anyone to view them.

62.    Dr. Goldfarb suffered damages as a result of this publication, including loss of credibility as a professor of medicine and as a physician, and embarrassment and humiliation.

WHEREFORE, Plaintiff prays for judgment against Defendant awarding Plaintiff:

1.    a Permanent Injunction enjoining and restraining Defendant and his respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendant, from disparaging or otherwise posting defamatory statements about Plaintiff;

2.    that the Court issue an Order at the conclusion of the present matter directing Defendant and his respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendant, to remove, delete, or

12

Case ID: 200501785

otherwise disable such posts; and to undertake such remedial efforts as the Court deems necessary to restore Plaintiff's reputation;

3.      actual damages in an amount to be determined at trial, but in no event less than $50,000;

4.      exemplary or punitive damages in an amount appropriate to punish Defendant and to make an example of Defendants to the community;

5.      attorney's fees and costs as permitted by law; and

6.      such other relief as the Court deems just and equitable under the circumstances.

FIRST LAW STRATEGY GROUP, LLC

BY:   _____
      DAVID S. SENOFF, ESQUIRE
      HILLARY B. WEINSTEIN, ESQUIRE
      121 S. BROAD STREET, SUITE 300
      PHILADELPHIA, PA 19107
      DSENOFF@FIRSTLAWSTRATEGY.COM
      HWEINSTEIN@FIRSTLAWSTRATEGY.COM
      PHONE: (215) 258-4700
      FAX: (215) 258-4777

DATED: OCTOBER 20, 2020

13

Case ID: 200501785

## <u>VERIFICATION</u>

I, Stanley Goldfarb, M.D., Plaintiff in the within action, verifies that he is acquainted with the facts and information set forth in the foregoing Complaint, and that the same are true and correct to the best of his knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

STANLEY GOLDFARB, M.D.

**Date:** October 20, 2020

Case ID: 200501785

Exhibit "A"

Case ID: 200501785

Exhibit "A" is included in a link on Page 3 of the Complaint in footnote 2.

Case ID: 200501785

Exhibit "B"

Case ID: 200501785

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/take-two-aspirin-and-call-me-by-my-pronouns-11568325291

OPINION | COMMENTARY

# Take Two Aspirin and Call Me by My Pronouns

At 'woke' medical schools, curricula are increasingly focused on social justice rather than treating illness.

By Stanley Goldfarb

Sept. 12, 2019 5:54 pm ET

The American College of Physicians says its mission is to promote the "quality and effectiveness of health care," but it's stepped out of its lane recently with sweeping statements on gun control. And that isn't the only recent foray into politics by medical professionals. During my term as associate dean of curriculum at the University of Pennsylvania's medical school, I was chastised by a faculty member for not including a program on climate change in the course of study. As the Journal reported last month, such programs are spreading across medical schools nationwide.

Why have medical schools become a target for inculcating social policy when the stated purpose of medical education since Hippocrates has been to develop individuals who know how to cure patients?

A new wave of educational specialists is increasingly influencing medical education. They emphasize "social justice" that relates to health care only tangentially. This approach is the result of a progressive mind-set that abhors hierarchy of any kind and the social elitism associated with the medical profession in particular.

These educators focus on eliminating health disparities and ensuring that the next generation of physicians is well-equipped to deal with cultural diversity, which are

Case ID: 200501785

worthwhile goals. But teaching these issues is coming at the expense of rigorous training in medical science. The prospect of this "new," politicized medical education should worry all Americans.



**PHOTO:** GETTY IMAGES

The traditional American model of medical training, which has been emulated around the world, emphasizes a scientific approach to treatment and subjects students to rigorous classroom instruction. Students didn't encounter patients until they had some fundamental knowledge of disease processes and knew how to interpret symptoms. They were expected to appreciate medical advances and be able to incorporate them into their eventual fields of practice. Medical education was demanding and occasionally led to student failure, but it produced a technically proficient and responsible physician corps for the U.S.

The traditional American model first came under attack by progressive sociologists of the 1960s and '70s, who condemned medicine as a failing enterprise because increased spending hadn't led to breakthroughs in cancer treatment and other fields. The influential critic Ivan Illich called the medical industry an instrument of "pain, sickness, and death," and sought to reorder the field toward an egalitarian social purpose. These ideas were long kept out of the mainstream of medical education, but the tide of recent political culture has brought them in.

As concerns about social justice have taken over undergraduate education, graduate schools have raced to develop curricula that will steep future educators in the same

ideology. Today a master's degree in education is often what it takes to qualify for key administrative roles on medical-school faculties. The zeitgeist of sociology and social work have become the driving force in medical education. The goal of today's educators is to produce legions of primary care physicians who engage in what is termed "population health."

This fits perfectly with the current administrator-rich, policy-heavy, form-over-function approach at every level of American education. Theories of learning with virtually no experimental basis for their impact on society and professions now prevail. Students are taught in the tradition of educational theorist Étienne Wenger, who emphasized "communal learning" rather than individual mastery of crucial information.

Where will all this lead? Medical school bureaucracies have become bloated, as they have in every other sphere of education. Curricula will increasingly focus on climate change, social inequities, gun violence, bias and other progressive causes only tangentially related to treating illness. And so will many of your doctors in coming years.

Meanwhile, oncologists, cardiologists, surgeons and other medical specialists are in short supply. The specialists who are produced must master more crucial material even though less and less of their medical-school education is devoted to basic scientific knowledge. If this country needs more gun control and climate change activists, medical schools are not the right place to produce them.

*Dr. Goldfarb is a former associate dean of curriculum at the University of Pennsylvania's Perelman School of Medicine.*

*Appeared in the September 13, 2019, print edition as '.'*

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Case ID: 200501785

Exhibit "C"

Case ID: 200501785



**Harrison Kalodimos, MD** 🌳
@HKalodimos

When the #LCME (med school accreditation body) found that Penn Med had disproportionately high rates of sexual and racial harassment, Stan Goldfarb (the author) called a class meeting where he berated our class for talking candidly about these experiences



Case ID: 200501785



**Harrison Kalodimos, MD** 🍷 @HKalodimos · Sep 15, 2019

Replying to @HKalodimos

His message to us was that we were too sensitive for reporting sexual harassment to the LCME and we should lie about these experiences to the accreditation. Body because it would hurt Penn's reputation.

💬 1          🔁 26          ♡ 129          ⬆️

**Harrison Kalodimos, MD** 🍷 @HKalodimos · Sep 15, 2019

This same year, they had to shut down a rotation because the doctor I charge of the rotation kept inappropriately touching female medical students. They didn't fire the doctor, they just tried to limit his exposure to medical students.

💬 3          🔁 19          ♡ 137          ⬆️

**Harrison Kalodimos, MD** 🍷 @HKalodimos · Sep 15, 2019

I'm glad that Goldfarb was finally forced out of Penn, but he is part of a noxious group of physicians who seek to hide abuse and protect abusers. This commentary is completely in line with who he is as a human being. H/t @MaraGordonMD for the link.

💬 1          🔁 27          ♡ 171          ⬆️

Case ID: 200501785

Exhibit "D"

Case ID: 200501785

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/med-school-needs-an-overhaul-11586818394

OPINION | COMMENTARY

# *Med School Needs an Overhaul*

Doctors should learn to fight pandemics, not injustice.

---

By Stanley Goldfarb

April 13, 2020 6:53 pm ET



Emergency-medicine residents load boxes of face shields in Las Vegas, April 10.

**PHOTO:** ETHAN MILLER/GETTY IMAGES

As the number of Covid-19 infections rises and the death toll mounts, the media is doing a good job of focusing on the safety of the health-care workforce and the capacity of hospitals to deal with a surge of desperately ill patients. What has received less attention is that many doctors haven't been adequately trained in medical school to deal with a situation like this.

Most medical schools don't require students to do coursework on pandemic response or practical preparation for a widespread and sustained emergency. American medical

Case ID: 200501785

training as a whole doesn't include a strong grounding in public-health issues or disaster preparedness. Instead, two of the nine specific curricular requirements decreed by the body that accredits medical schools are focused on social issues in medicine, including "the diagnosis of common societal problems and the impacts of disparities in health care on medically underserved populations," particularly "in a multidimensional and diverse society." None mention public health or epidemics.

Physicians are highly educated, but that doesn't mean they know everything—even things broadly related to the practice of medicine. When doctors speak on topics they don't understand, they can confuse the public and other physicians. While medical schools require students to study statistics, these courses are generally superficial. They wouldn't equip most physicians to grapple with epidemic models like the ones on which Deborah Birx has been briefing the White House press.

It has been discouraging to see doctors on news programs struggle to explain the principles of drug testing, the nature of the scientific method, and the meaning (both positive and negative) of uncontrolled drug trials. Television audiences love a good story, but clinical anecdotes can't prove a drug is useful. That job belongs to randomized controlled trials or other complex experimental approaches, the design of which is a complicated topic that many, if not most, doctors would struggle to explain.

A critical examination of undergraduate medical education will be among the many reassessments this country has to make in the wake of this crisis. Many schools don't require students to do formal training in emergency medicine. While physicians receive valuable practical experience during their residencies in internal medicine and surgery, they should all have the benefit of rigorous classroom study in ventilator management and other aspects of critical-care medicine, preferably in the fourth year of medical school.

Above all, the medical profession should abandon the fantasy that physicians can be trained to solve the problems of poverty, food insecurity and racism. They have no clinical tools with which to address these issues. The public may not realize that well-funded organizations like the Beyond Flexner Alliance advocate for devoting a substantial part of medical-school teaching to social and organizational topics.

Case ID: 200501785

If curricular reform is to come, it should take into account the essential role physicians must play in a public-health crisis. It should aim to produce physicians who are prepared to help battle deadly pandemic diseases like Covid-19.

Students should enter the field of medicine with a clear understanding that they will one day face a public-health catastrophe like the one New York's doctors and nurses are currently staring down with great courage. Health-care workers are the tip of the spear during an outbreak of disease. We need to be sure they have the tools and training to succeed in fighting the next pandemic when it comes. And it will.

*Dr. Goldfarb is a former associate dean of curriculum at the University of Pennsylvania's Perelman School of Medicine.*

*Appeared in the April 14, 2020, print edition as '.'*

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Case ID: 200501785

Exhibit "E"

Case ID: 200501785

Strategy -...    🅲🅳🅲 Data & Surveillance    G Workspace Webmai...

← **Harrison Kalodimos, MD** 🌷
7,780 Tweets

[ Follow ]

If oil goes any lower, Exxon Mobil might have to layoff some members of Congress.

💬 903          ⟲ 34.4K          ♡ 172.2K          ⬆

Show this thread

**Harrison Kalodimos, MD** 🌷 @HKalodimos · Apr 14          ⌄
It looks like Stan Goldfarb in back in the WSJ, aghast that my generation of physicians cares about health equity and social determinants of health. As a reminder, Goldfarb actively tried to suppress reporting of sexual and racial harassment at @PennMedicine

> **Harrison Kalodimos, MD** 🌷 @HKalodimos · Sep 15, 2019
> When the #LCME (med school accreditation body) found that Penn Med had disproportionately high rates of sexual and racial harassment, Stan Goldfarb (the author) called a class meeting where he berated our class for talking candidly about these experiences  wsj.com/articles/take-...
>
> Show this thread

💬          ⟲ 1          ♡ 3          ⬆

⟲ Harrison Kalodimos, MD 🌷 Retweeted

**B. Bobby Chiong, MD** @brianchiong · Apr 13          ⌄
Replying to @ohTHATnurse
💯



**Julia, DO**
@JuliaNEM33

Show more

**What's happenin**

News · 5 hours ago
**Belarus presidential ca
Sviatlana Tsikhanouska
Lithuania**
Trending with: Lithuania

**#ProjectPower** ✏
Netflix has the blockbus
↗ Promoted by NetflixFilm

Trending in United States
**Kris Jong Un**

COVID-19 · 3 hours ago
**New Zealand records f
19 cases in 102 days**
Trending with: New Zealand

Trending in New Jersey

Search Twitter

Case ID: 200501785