IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STANLEY GOLDFARB<br><br>          Plaintiff,<br><br>   v.<br><br>HARRISON A. KALODIMOS,<br><br>         Defendant. | CIVIL ACTION<br>NO. 20-5667 |

## OPINION

**Slomsky, J.**                                                      **May 14, 2021**

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND .................................................................................................. 1

   A.   Plaintiff's February 2016 Lecture to the Penn Medicine 2016 Graduating Class ............. 2

   B.   Plaintiff's September 2019 *Wall Street Journal* Article and
      Defendant's First Four Tweets............................................................................. 4

   C.   Plaintiff's April 2020 *Wall Street Journal* Article and
      Defendant's Fifth Tweet ..................................................................................... 6

   D.   The Complaint, Motion to Dismiss, and Motion for Remand ........................... 7

III. STANDARD OF REVIEW.................................................................................... 8

IV.  ANALYSIS ........................................................................................................ 10

   A.   The Court Has Original Subject Matter Jurisdiction Over this Case Based Upon
      Diversity of Citizenship Jurisdiction ............................................................... 10

   B.   The Court Has Specific Personal Jurisdiction Over Defendant....................... 14

      1.   The Framework of a Personal Jurisdiction Analysis .................................. 15

      2.   Defendant's Five Tweets Give Rise to Personal Jurisdiction
      Under the Calder Effects Test........................................................................ 17

a.    Defendant Expressly Aimed His Five Tweets at Pennsylvania ............................... 17

b.    The Remaining Elements of the <u>Calder</u> Test Elements Are Met .............................. 19

C.    Plaintiff Has Sufficiently Alleged Claims Upon Which Relief Can Be Granted ............ 20

1.    Plaintiff Has Sufficiently Alleged a Claim of Libel ..................................................... 21

a.    The Court Need Not Address Whether Defendant Acted with Actual Malice at this Stage ........................................................................ 21

b.    The Framework of a Libel Claim ............................................................... 23

c.    Defendant's First, Second, Fourth, and Fifth Tweets are Capable of a Defamatory Meaning ......................................................................... 25

d.    Defendant's Third Tweet is Not Capable of a Defamatory Meaning ...................... 30

2.    Plaintiff Has Sufficiently Alleged a Claim of Defamation <u>Per</u> <u>Se</u> ............................... 30

3.    Plaintiff Has Sufficiently Alleged a Claim of False Light Invasion of Privacy ........... 32

V.    CONCLUSION ................................................................................................................ 33

## I.  INTRODUCTION

This action arises out of five Tweets [1] written by Defendant Harrison Kalodimos. Defendant published the Tweets in response to Plaintiff Stanley Goldfarb's musings on modern medical school curricula in two articles published in the *Wall Street Journal*. Goldfarb submits that the five Tweets defame him and place him in a false light.

On May 28, 2020, Plaintiff initiated this suit by filing a Complaint in the Court of Common Pleas of Philadelphia County, and on November 13, 2020, Defendant removed the case to this Court. (See Doc. No. 1 at 2; see also Doc. No. 1-2.) One week later, Defendant filed a Motion to Dismiss the Complaint, alleging: (1) this Court lacks personal jurisdiction over him, and (2) the Complaint fails to state a claim against him. (See Doc. No. 2.) Thereafter, Plaintiff filed a Motion to remand the case to the Court of Common Pleas, contending this Court lacks subject matter jurisdiction over this case. (See Doc. No. 10.)

For the reasons set forth below, the Motion to Dismiss (Doc. No. 2) and Motion for Remand (Doc. No. 10) will be denied.

## II.  BACKGROUND[2]

Plaintiff Stanley Goldfarb, M.D. is a Professor of Medicine and former Associate Dean of Curriculum at the Perelman School of Medicine at the University of Pennsylvania ("Penn Medicine"). (See Doc. No. 1-2 at 5 ¶ 7.) He also practices medicine at his nephrology practice

---

[1]  A Tweet is "a post made on the Twitter online message service." Tweet, Merriam-Webster Dictionary (online ed.) (last accessed May 14, 2021), https://www.merriam-webster.com/dictionary/tweet.

[2]  The following facts are taken from the Complaint (Doc. No. 1-2) and attached exhibits and are accepted as true for purposes of this Opinion. See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents.").

located in Pennsylvania.  (See id. at 15 ¶ 62; see also Doc. No. 11 at 5.)  Defendant Harrison Kalodimos, M.D. is a Class of 2016 graduate of Penn Medicine and practices medicine in Seattle, Washington.  (See id. ¶¶ 8-9.)  Defendant's alleged defamatory statements are grounded in three pertinent events: (1) a February 22, 2016 speech given by Plaintiff to the Penn Medicine 2016 graduating class, (2) a September 2019 article written by Plaintiff published in the *Wall Street Journal*, and (3) an April 2020 article written by Plaintiff published in the *Wall Street Journal*. (See id. at 6-13.)  Each event will be discussed chronologically below.

### A. Plaintiff's February 2016 Lecture to the Penn Medicine 2016 Graduating Class

On February 22, 2016, Plaintiff Goldfarb, who was then the Associate Dean of Curriculum at Penn Medicine, convened the Penn Medicine 2016 graduating class, of which Defendant was a member, to discuss two topics: (1) the school's recent Liaison Committee on Medical Education ("LCME")[3] accreditation review results ("LCME Review") and (2) an impending LCME graduation questionnaire that students would soon be completing.  (See id. at 6-7 ¶¶ 14, 17.) Plaintiff began his speech by noting that Penn Medicine received favorable reviews in all but 2 of the 190 LCME Review standards, one of which being whether students had been discriminated against.  (See id. at 7 ¶¶ 18-19.)  He noted that this unfavorable discrimination standard was based in part on "a bunch of [students] wr[iting] in that they had been discriminated against" at Penn Medicine.[4]  (Id. ¶ 19.)

---

[3]  According to Plaintiff, "[t]he LCME is an accrediting body for medical education programs leading to an MD degree in the United States and Canada."  (Doc. No. 1-2 at 6 n.1.)

[4]  Plaintiff does not explain the exact effect the student responses had on the LCME standards ratings; however, it is evident from the Complaint that the responses influenced the ratings.

Plaintiff then began to explain that he believed students misinterpreted the meaning of the word "discrimination" in answering the LCME Review question. (See id. ¶ 20.) He continued, opining that not all acts that are insulting are discriminatory and proffering that he could "insult everyone in this room right now . . . and I would have insulted all of you, but I would not have discriminated." (Id) (quotation marks omitted). Continuing over the crowd's laughter, he stated:

> Discrimination is actually doing something horrible that prevents you from getting something that's rightfully yours, treating you in a way that prevents you from having something happen. Now, people say a lot of stupid things that you've encountered in the [hospital] wards, and maybe even in lectures. Things that people shouldn't have . . . said, things that were uncivil, things that made you uncomfortable, none of those things should happen. But they really aren't discrimination. So we have to go through a discussion with [LCME] about exactly what people meant. It was much more about uncivil and thoughtless and stupid and ridiculous and ignorant sort of statements. It sounded like a presidential campaign . . . more than anything else. So . . . words are very important. So we'll respond and show LCME the data that we have and make the point that this represented uncivil behavior rather than true discrimination, preventing people. Maybe there were episodes of discrimination but not nearly the frequency that was implied by this.

(Id. at 7-8 ¶ 20) (second alteration in original).

Thereafter, Plaintiff began discussing the upcoming LCME graduation questionnaire the class had to complete. (See id. at 8 ¶ 21.) He underscored the importance of receiving accurate student responses so the administration could identify and address problems at Penn Medicine. (See id.) He also reaffirmed to the class that "[w]e want honesty above all else. We want you [to] tell us exactly . . . what you think, but we want you to think hard about what exactly is being asked." (Id.) Similar to the prior LCME Review responses, the graduation questionnaire, he explained, would ask questions about student mistreatment:

> The final thing that comes up and this is the one thing that we worry about very much, is this idea of "mistreatment." Now, mistreatment definitely goes on, and it goes on in all sorts of modes: it often goes on between classmates, which we've heard; it goes on between resident[] [physicians] and students, and it goes on between faculty and residents, and sometimes faculty and students. We'd love it to

be zero, it's never going to be zero. But on the other hand, we need to have a really thoughtful sense of it because if we're seen as having a tremendous problem in this area, well then we got to rip up what we do now and change things. And if we do have a tremendous problem in this area, that's what we should do. On the other hand, if we don't, then we need to just make sure that our current systems work well. So . . . , when they talk about "mistreatment," . . . , understand that we have policies here that we've illustrated to you on several occasions . . . . We expect that when people are mistreated that we find out about it. Our current policy, by the way, [has been] changed in the last few years . . . . [A]nd part of that change has been a result of information we've gotten from those graduation questionnaires. So getting this information is really incredibly important and helpful to us.

(Id. at 9 ¶ 23.) Plaintiff concluded by stating:

So we want to hear the good things, we want to hear the bad things. And we want you to just take it very seriously and carefully because it will influence how students in future years are treated here and the opportunities that they have here. . . . So, take it seriously. That's really the message we have here. It really, really is important that you do it in a really thoughtful way.

(Id. ¶ 25.)

**B.** **Plaintiff's September 2019 *Wall Street Journal* Article and Defendant's First Four Tweets**

Over three years after the February 2016 speech, Plaintiff wrote a three-page article published on September 12, 2019 in the *Wall Street Journal*, entitled "Take Two Aspirin and Call Me by My Pronouns." (See id. at 10 ¶ 27.) He began the article by discussing "the recent foray into politics by medical professionals," and asking "[w]hy have medical schools become a target for inculcating social policy when the stated purpose of medical education since Hippocrates has been to develop individuals who know how to cure patients?" (Id. at 21.) Plaintiff suggested that altering medical schools' curricula to emphasize social justice and cultural diversity training are "worthwhile goals. . . . coming at the expense of rigorous training in medical science." (Id. at 21-22.) He concluded by stating that "[i]f this country needs more gun control and climate change activists, medical schools are not the right place to produce them." (Id. at 23.)

Three days later, Defendant Kalodimos wrote and published the following four Tweets in a thread that contained a hyperlink to Plaintiff's article:



When the #LCME (med school accreditation body) found that Penn Med had disproportionately high rates of sexual and racial harassment, Stan Goldfarb (the author) called a class meeting where he berated our class for talking candidly about these experiences



Harrison Kalodimos, MD  @HKalodimos · Sep 15, 2019
Replying to @HKalodimos
His message to us was that we were too sensitive for reporting sexual harassment to the LCME and we should lie about these experiences to the accreditation. Body because it would hurt Penn's reputation.
♡ 1    ⟳ 26    ♡ 129    ⬆

Harrison Kalodimos, MD  @HKalodimos · Sep 15, 2019
This same year, they had to shut down a rotation because the doctor I charge of the rotation kept inappropriately touching female medical students. They didn't fire the doctor, they just tried to limit his exposure to medical students.
♡ 3    ⟳ 19    ♡ 137    ⬆

Harrison Kalodimos, MD  @HKalodimos · Sep 15, 2019
I'm glad that Goldfarb was finally forced out of Penn, but he is part of a noxious group of physicians who seek to hide abuse and protect abusers. This commentary is completely in line with who he is as a human being. H/t @MaraGordonMD for the link.
♡ 1    ⟳ 27    ♡ 171    ⬆

(Id. at 25-26.)

**C. Plaintiff's April 2020 *Wall Street Journal* Article and Defendant's Fifth Tweet**

Thereafter, Plaintiff wrote a second three-page article published on April 13, 2020 in the *Wall Street Journal*, entitled "Med School Needs an Overhaul." (See id. at 11 ¶ 34.) With the commencement of the COVID-19 pandemic as his background, Plaintiff remarked that "many doctors haven't been adequately trained in medical school to deal with a situation like this." (Id. at 28.) He reiterated his qualms from the September 2019 article, noting that "[m]ost medical schools don't require students to do coursework on pandemic response or practical preparation for a widespread and sustained emergency," but do require coursework in "social issues in medicine." (Id. at 28-29.) He concluded by stating "[i]f curricular reform is to come, it should take into account the essential role physicians must play in a public-health crisis. It should aim to produce physicians who are prepared to help battle deadly pandemic diseases like C[OVID]-19." (Id. at 30.)

The following day, Defendant authored another Tweet in the same thread as his original Tweets from September 2019:



(Id. at 32.)

### D.     The Complaint, Motion to Dismiss, and Motion for Remand

On May 28, 2020, Plaintiff initiated this case by filing a Writ of Summons against Defendant in the Court of Common Pleas of Philadelphia County, Pennsylvania, and on October 20, 2020, Plaintiff filed a Complaint.  (See Doc. No. 1 at 4 ¶¶ 1-2.)  Based on Defendant's five Tweets, Plaintiff alleges in the Complaint claims against Defendant for libel and defamation per se (Count I) and false light invasion of privacy (Count II).  (See Doc. No. 1-2 at 13-16.)

On November 13, 2020, Defendant removed the case to this Court, pursuant to 28 U.S.C. § 1332(a).  (See Doc. No. 1 ¶¶ 11-25.)  This statute essentially provides that a federal court has original subject matter jurisdiction of all civil actions where the parties are citizens of different states and the amount in controversy exceeds $75,000.  (See Doc. No. 1 ¶¶ 11-25.)

On November 20, 2020, Defendant filed a Motion to Dismiss the Complaint for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted.  (Doc. No. 2.)  First, he contends that as a citizen of Washington State, this Court lacks either general or specific personal jurisdiction over him.  (See Doc. No. 2-1 at 18-24.)  Second, he argues that the Complaint fails to state a claim against him because: (1) Plaintiff published his articles as a limited-purpose public figure, and the Complaint lacks sufficient facts showing Defendant published his Tweets with actual malice; and (2) Defendant's Tweets do not comprise the torts of libel, defamation per se, or false light invasion of privacy because they contain true statements and his opinions are based on disclosed, truthful facts.  (See id. at 27-38.)  On December 4, 2020, Plaintiff filed a Response in Opposition to the Motion to Dismiss (Doc. No. 8), and on December 10, 2020, Defendant filed a Reply (Doc. No. 9).

Thereafter, on December 14, 2020, Plaintiff filed a Motion to Remand the case to the Court of Common Pleas of Philadelphia County.  (Doc. No. 10.)  In the Motion, he claims that the Court

lacks original subject matter jurisdiction over this case because Defendant has not shown by a preponderance of the evidence that the amount in controversy required for diversity of citizenship jurisdiction is met. (See id. at 12-15.) On December 21, 2020, Defendant filed a Response in Opposition to the Motion (Doc. No. 11), and on December 28, 2020, Plaintiff filed a Reply (Doc. No. 12).

Finally, on February 3, 2021, the Court held a hearing on the Motion to Dismiss and Motion for Remand. (See Doc. No. 15.) Both Motions are now ripe for disposition, and for reasons that follow, the Motion to Dismiss and Motion for Remand will be denied.

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that

a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

In addition, Federal Rule of Civil Procedure 12(b)(2) provides for dismissal of an action when the Court does not have personal jurisdiction over a defendant. "Once challenged, the plaintiff bears the burden of establishing personal jurisdiction." O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007). To show personal jurisdiction, a plaintiff may rely on the allegations in the complaint, affidavits, or other evidence. See Metcalfe v. Renaissance Marine,

Inc., 566 F.3d 324, 330 (3d Cir. 2009).  Where, as here, the court chooses not to conduct an evidentiary hearing, a plaintiff need only demonstrate a prima facie case of jurisdiction to defeat a motion to dismiss.  See Carteret Sav. Bank v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992).  In deciding a motion to dismiss for lack of personal jurisdiction, the Court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."  Id.

## IV.     ANALYSIS

Defendant Kalodimos argues that the Complaint should be dismissed because (1) this Court lacks personal jurisdiction over him and (2) the Complaint fails to state a claim for which relief can be granted.  (See Doc. No. 2-1 at 8.)  Additionally, Plaintiff Goldfarb contends that this Court lacks subject matter jurisdiction over the case, and it should be remanded to the Court of Common Pleas of Philadelphia County.  (See Doc. No. 10 at 2.)  Initially, the Court will evaluate whether it has original subject matter jurisdiction over the case.[5]  Next, it will analyze whether it has personal jurisdiction over Defendant.  Finally, the Court will address whether the Complaint states a claim for which relief can be granted.

### A.     The Court Has Original Subject Matter Jurisdiction Over This Case Based Upon Diversity of Citizenship Jurisdiction

This Court has original subject matter jurisdiction based upon diversity of citizenship jurisdiction, pursuant to 28 U.S.C. § 1332(a), because the parties are citizens of different states, and Defendant has shown by a preponderance of the evidence that the amount in controversy

---

[5]  The Third Circuit Court of Appeals has noted that "[a]n actual determination must be made [about] whether subject-matter jurisdiction exists before a court may turn to the merits of the case."  Tagayun v. Lever & Stolzenberg, 239 F. App'x 708, 710 (3d Cir. 2007).  Moreover, "[a] district court must be certain that federal subject-matter jurisdiction is proper before entertaining a defendant's motion under Federal Civil Rule 12 to dismiss the plaintiff's complaint for failure to state a claim upon which relief may be granted."  Abdullah v. Small Bus. Banking Dep't of Bank of Am., 628 F. App'x 83, 84 n.1 (3d Cir. 2016) (quotation marks and citations omitted).

exceeds $75,000. In the Motion for Remand, Plaintiff contends that this Court lacks subject matter jurisdiction because Defendant "cannot marshal sufficient proof that Plaintiff's claims establish the requisite amount in controversy." (Doc. No. 10 at 12.) In response, Defendant submits that when considering Plaintiff's request in the Complaint for damages in excess of $50,000, his demand for punitive damages, and his alleged loss of income, the amount in controversy clears the $75,000 threshold. (See Doc. No. 11 at 10-14.)

Under 28 U.S.C. § 1441(a), a defendant may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction . . . ." Federal courts "have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." § 1332(a)(1).

The Federal Courts Jurisdiction and Venue Clarification Act, Pub. L. No. 112-63, 125 Stat. 758 (2011), "clarifie[s] the procedure and standard for determining if the amount in controversy requirement has been met when an action is removed from the state court." Karlberg v. Santander Bank, N.A., No. 17-3561, 2017 WL 4810800, at *3 (E.D. Pa. Oct. 25, 2017). The statute, codified in 28 U.S.C. § 1446(c), states as follows:

> (2)     If removal of a civil action is sought on the basis of the jurisdiction conferred by section 1332(a), the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy, except that—
>
> (A)     the notice of removal may assert the amount in controversy if the initial pleading seeks—
>
> (i)     nonmonetary relief; or
>
> (ii)     a money judgment, but the State practice either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded; and

(B)     removal of the action is proper on the basis of an amount in controversy asserted under subparagraph (A) if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds [$75,000].

28 U.S.C. § 1446(c).

In ascertaining the amount in controversy in removal cases, courts first look to the complaint.  See Samuel-Bassett v. KIA Motors Am., Inc., 357 F.3d 392, 398 (3d Cir. 2004).  Here, the Complaint asserts an open-ended claim for damages in excess of $50,000.  (See Doc. No. 1-2 at 16 ¶ 3.)  "However, where[, as here,] 'the State practice either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded,' removal is proper only if the court finds, by a preponderance of the evidence, that the amount in controversy exceeds $75,000.00."  Evans v. Zhang, No. 17-3801, 2017 WL 4547912, at *1 (E.D. Pa. Oct. 12, 2017) (quoting 28 U.S.C. § 1446(c)(2)(A)(ii)-(B)); see also Dorley v. Save-A-Lot, No. 16-4510, 2016 WL 6213074, at *3 (E.D. Pa. Oct. 25, 2016) (determining that the defendants must prove by a preponderance of the evidence that the plaintiff's claims exceed $75,000 because "Pennsylvania does not permit a demand for a specific sum, and [the plaintiff] seeks open-ended damages in excess of $50,000") (quotation marks omitted) (citing Pa. R. Civ. P. 1021(b); Dart Cherokee Basin Operating Co. v. Owens, 574 U.S. 81, 88 (2014) ("If the plaintiff contests the defendant's [amount in controversy] allegation, § 1446(c)(2)(B) instructs: '[R]emoval . . . is proper on the basis of an amount in controversy asserted' by the defendant 'if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds' the jurisdictional threshold") (second alteration in original).

Further, "[w]hen both actual and punitive damages are recoverable, punitive damages are properly considered in determining whether the jurisdictional amount has been satisfied."  Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1046 (3d Cir. 1993).  The Third Circuit has noted that

"claims for punitive damages 'will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum.'" Huber v. Taylor, 532 F.3d 237, 244 (3d Cir. 2008) (quoting Golden ex rel. Golden v. Golden, 382 F.3d 348, 355 (3d Cir. 2004)).  Consequently, courts in this District hold that the amount in controversy requirement is met when a punitive to compensatory damages ratio of at least 1-to-1 exceeds the $75,000.00 threshold.  See, e.g., Minissale v. State Farm Fire & Cas. Co., 988 F. Supp. 2d 472, 473-75, 477 (E.D. Pa. 2013) (holding that breach of contract claim for compensatory damages of $55,315 and punitive damages for bad faith under 42 Pa.C.S. § 8371 meet amount in controversy).

Here, Plaintiff only disputes whether Defendant has met his burden of showing by a preponderance of the evidence that the amount in controversy exceeds $75,000.[6]  Because the Complaint does not limit Plaintiff's damages to an amount under $75,000, the Court must independently appraise the amount in controversy in both Counts.  On the face of the Complaint, Plaintiff seeks "actual damages in an amount . . . [not] less than $50,000; . . . exemplary or punitive damages . . . [;] . . . attorney's fees and costs as permitted by law; and . . . such other relief as the Court deems just and equitable . . . ." (Doc. No. 1-2 at 16 ¶¶ 3-6.)  In describing the alleged injuries from Defendant's five Tweets, Plaintiff claims he suffered "irreparable damage to his reputation . . . . including loss of credibility as a professor of medicine and as a physician, and embarrassment and humiliation." (Id. at 14-15 ¶¶ 55, 62.)

---

[6]  Plaintiff does not dispute the other requirement under 28 U.S.C. § 1332 that the parties are citizens of different states.  (See Doc. No. 10 at 12.)  Because Plaintiff is domiciled in the Commonwealth of Pennsylvania and Defendant is domiciled in Washington State, the parties are completely diverse.  (See Doc. No. 1-2 at 5 ¶¶ 7-8.)

In an attempt to value the amount of Plaintiff's requested damages, Defendant notes that Plaintiff earns over $100,000 annually from his professorial position alone, realizes income from his nephrology practice, and has once charged at least $500/hour for his services as an expert witness.  (See Doc. No. 11 at 5, 13-14.)  In comparing the alleged harm to Plaintiff with his substantial income, it is likely that actual damages, should they be proven, would exceed "an amount . . . [not] less than $50,000," if not actually exceed $75,000 on their own.  (Doc. No. 1-2 at 5 ¶ 3.)  Moreover, an award of a 1-to-1 punitive-to-compensatory damages ratio would far exceed the jurisdictional threshold amount.  Further, any court costs and attorney's fees that Plaintiff seeks increase the likelihood that the amount in controversy would exceed $75,000.  And at this stage, it is difficult to place a monetary value on Plaintiff's purported reputational and professional harm.  For these reasons, Defendant has established by a preponderance of the evidence that the amount in controversy in this action exceeds $75,000.  Thus, the requirements for removal based on diversity of citizenship jurisdiction have been satisfied, the Court has original subject matter jurisdiction over this case, and Plaintiff's Motion for Remand will be denied.

**B.      The Court Has Specific Personal Jurisdiction Over Defendant**

In the Motion to Dismiss, Defendant contends that the Court lacks both general and specific personal jurisdiction over him.  He claims, and Plaintiff agrees, that general personal jurisdiction is lacking because he is domiciled in Washington State, not the Commonwealth of Pennsylvania.  (See Doc. Nos. 2-1 at 18; 8 at 16 n.5.)  The parties contest, however, whether Defendant's five Tweets constitute sufficient contact with Pennsylvania to support the Court's exercise of specific personal jurisdiction over Defendant.  (See Doc. Nos. 2-1 at 18-24; 8 at 15-21.)

**1.      The Framework of a Personal Jurisdiction Analysis**

Personal jurisdiction refers to the court's power over parties to a lawsuit.  "A federal district court may assert personal jurisdiction over a nonresident of a state in which the court sits to the extent authorized by the law of that state."  Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 436 (3d Cir. 1987) (citing Fed. R. Civ. P. 4(e)).  This Court sits in Pennsylvania, which permits jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States."  42 Pa.C.S. § 5322(b); see also D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009).  Therefore, to determine whether personal jurisdiction can be exercised over Defendant, the Court must evaluate whether, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendant has "certain minimum contacts with [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  D'Jamoos, 566 F.3d at 102 (quotation marks omitted) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

There are two types of personal jurisdiction—general jurisdiction and specific jurisdiction. General jurisdiction, which is not in question here, refers to a situation where the nonresident's contacts with the forum state are so "continuous and systematic" that the nonresident is essentially "at home" in the forum state.  Daimler AG v. Bauman, 571 U.S. 117, 127 (2014) (quotation marks and citations omitted).  Specific jurisdiction, on the other hand, exists if the defendant has "'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  Metcalfe, 566 F.3d at 334 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)); see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., --- U.S. ----, 141 S.Ct. 1017, 1026, --- L.Ed.2d ---- (2021) ("[O]ur most

common formulation of the rule demands that the suit arise out of <u>or relate to</u> the defendant's contacts with the forum . . . . [T]he back half . . . contemplates that some relationships will support jurisdiction without a causal showing") (quotation marks and citation omitted).

When alleging personal jurisdiction over nonresident defendants who allegedly committed an intentional tort outside the forum, a plaintiff must meet the United States Supreme Court's "effects test" set forth in <u>Calder v. Jones</u>.[7]  465 U.S. 783 (1984).  Personal jurisdiction is established under this test if the plaintiff shows:

> (1)     The defendant committed an intentional tort;
>
> (2)     The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort; [and]
>
> (3)     The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

<u>Remick v. Manfredy</u>, 238 F.3d 248, 258 (3d Cir. 2001) (quoting <u>IMO Indus., Inc. v. Kiekert AG</u>, 155 F.3d 254, 265-66 (3d Cir. 1998)).  In <u>Marten v. Godwin</u>, the Third Circuit went on to explain the interplay between the three "effects test" elements:

> Only if the "expressly aimed" element of the effects test is met need we consider the other two elements.  To establish that the defendant "expressly aimed" his conduct, the plaintiff has to demonstrate the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum.  If a plaintiff fails to show that the defendant manifest[ed] behavior

---

[7]   Usually, a plaintiff can establish a forum's specific jurisdiction over a defendant through the "traditional specific jurisdiction analysis," which requires showing that: (1) the defendant purposefully established minimum contacts in the forum state, (2) the litigation arose out of or relates to one of the contacts, and (3) exercising personal jurisdiction over the defendant "comport[s] with fair play and substantial justice."  <u>Marten v. Godwin</u>, 499 F.3d 290, 296 (3d Cir. 2007) (quotation marks and citation omitted).  However, a plaintiff alternatively "can demonstrate a court's jurisdiction over a defendant" by meeting the <u>Calder</u> "effects test" because "[t]he effects test and traditional specific jurisdiction analysis are different, but they are cut from the same cloth."  <u>Id.</u> at 297.

intentionally targeted at and focused on the forum, the plaintiff fails to establish jurisdiction under the effects test.

499 F.3d 290, 297-98 (3d Cir. 2007) (certain quotation marks and citations omitted) (alteration in original).

### 2. Defendant's Five Tweets Give Rise to Personal Jurisdiction Under the Calder Effects Test

Defendant's five Tweets about Plaintiff, a Pennsylvania resident, and Penn Medicine, a Pennsylvania medical school, give rise to personal jurisdiction under the Calder effects test. The Court will first address whether Defendant expressly aimed his activity at the forum, and then will address the other two elements of the Calder "effects test." See Marten, 499 F.3d at 297-98 (analyzing the expressly aimed factor of the effects test first).

#### a. Defendant Expressly Aimed His Five Tweets at Pennsylvania

To begin with, "[j]urisdiction is proper when the state of a plaintiff's residence is 'the focus of the activities of the defendant out of which the suit arises.'" Id. at 298 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984)). But in evaluating the "expressly aimed" prong of the effects test, the Third Circuit has stated that a plaintiff's residence in a forum alone is insufficient. See id. For example, in Marten, the Third Circuit rejected a plaintiff's contention that his residency gave rise to jurisdiction over defendants for their alleged defamatory statements against him. See id. at 298-99. There, plaintiff, a student at the University of Kansas's School of Pharmacy, was expelled from the University's online program for committing multiple plagiarism offenses. See id. at 294. Plaintiff then sued the school and his former professors for defamation and retaliation in Pennsylvania, alleging that his Pennsylvania residency resulted in defendants expressly aiming their alleged defamation at Pennsylvania. See id. at 299. Unpersuaded, the Third Circuit highlighted plaintiff's evidentiary shortcomings:

[Plaintiff] alleges defamation, but nothing in the record indicates that defendants made defamatory statements or sent defamatory material to anyone in Pennsylvania (other than, perhaps, [plaintiff]). . . . Here, even if we were to assume the truth of all of [plaintiff]'s allegations, and assume he felt the brunt of the harm in Pennsylvania, we still could not find jurisdiction. He failed to allege any specific facts showing a deliberate targeting of Pennsylvania. <u>See</u> <u>IMO Indus.</u>, 155 F.3d at 265-66. Accordingly, [plaintiff] failed to show jurisdiction over these defendants for his defamation claim.

. . .

[Plaintiff] relies on the fact that at the time of his expulsion he resided in Pennsylvania. At oral argument, his counsel asserted that Pennsylvania has jurisdiction over these nonresident defendants because <u>IMO Industries</u> instructs courts to focus on the place where a plaintiff has suffered harm and "[t]he constitutional harm in this case was felt where [plaintiff] resided, where [he] asserted his [First Amendment] rights." This misconstrues our analysis in <u>IMO Industries</u>. True, the effects test asks whether the plaintiff felt the brunt of the harm in the forum state, but it also asks whether defendants <u>knew</u> that the plaintiff would suffer the harm there and whether they <u>aimed</u> their tortious conduct at that state. <u>See</u> <u>IMO Indus.</u>, 155 F.3d at 264 (explaining "the geographical locus of the harm caused" by an intentional tort is only part of the test).

<u>Id.</u> at 298-99 (sixth and ninth alterations in original).

Here, unlike in <u>Marten</u>, Plaintiff has presented facts to show that Defendant expressly aimed his allegedly tortious conduct at Pennsylvania with knowledge that Plaintiff "would suffer the harm there . . . ." <u>Id.</u> at 299. In the Complaint, Plaintiff relies on far more evidence than only his residency to show that Defendant targeted his Tweets at Pennsylvania. As shown by the content of his Tweets and attendance at Penn Medicine, Defendant knew Plaintiff was affiliated with Penn Medicine, a longstanding Pennsylvania institution. (<u>See</u> Doc. No 1-2 at 26.) Moreover, he refers to Penn Medicine in his string of Tweets. (<u>See</u> <u>id.</u> at 25-26, 32.) His Tweets also concern two alleged events that occurred in Pennsylvania while Defendant was in the forum: (1) the February 2016 lecture Plaintiff gave while he and Defendant were in Pennsylvania; and (2) actions taken by Penn Medicine in response to alleged misconduct by a physician occurring in Pennsylvania. (<u>See</u> <u>id.</u> at 25-26; <u>see also</u> Doc. No. 8 at 18.) Unlike the position of the plaintiff in

Marten, who attended online classes at the University of Kansas, Defendant wrote his Tweets based on knowledge and information he ascertained while attending a class in-person at a University in the forum state. Taken together, these facts make clear that, as the Supreme Court noted in Calder, Pennsylvania "is the focal point both of the story and of the harm suffered." Calder, 465 U.S. at 789.

In arguing against personal jurisdiction, Defendant claims that his unsophisticated approach here is distinguishable from the facts of Calder, wherein professional journalists used phone calls, sources, and travel to prepare the allegedly defamatory article. (See Doc. No. 9 at 1-2); see also Calder, 465 U.S. at 785-86. While Defendant's seemingly hurried tweeting undoubtedly required less journalistic experience than in Calder, the outcome does not change here. Regardless of the preparation and medium used, Defendant's Tweets share the same critical qualities for personal jurisdiction purposes as the defamatory statements in Calder because they "concern[] the [Pennsylvania] activities of a [Pennsylvania] resident . . . . impugned the professionalism of [Plaintiff] whose . . . career was centered in [Pennsylvania]. . . . was drawn from [Pennsylvania] sources, and the brunt of the harm . . . was suffered in [Pennsylvania]." Calder, 465 U.S. at 788-89 (footnote omitted). For all these reasons, Defendant expressly aimed his Tweets at Pennsylvania.

### b. The Remaining Elements of the Calder Test Elements Are Met

Finally, when reviewing the allegations in the Complaint in the light most favorable to Plaintiff, he also has sufficiently pled the other two "effects test" factors: "(1) [t]he defendant committed an intentional tort; [and] (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort." Remick, 238 F.3d at 258 (quotation omitted). First, he avers in the Complaint that

Defendant committed the intentional torts of libel, defamation per se, and false light invasion of privacy.  (See Doc. No. 1-2 at 13, 15.)  These claims are established by the allegations in the Complaint as discussed more fully in Section IV.C, infra.

Second, Plaintiff alleges that Defendant's Tweets have impugned his professional reputation and credibility and caused him embarrassment and humiliation.  (See id. at 14-15 ¶¶ 55-56, 62.)  The averments in the Complaint would support such claims.  As a result, Plaintiff felt the brunt of the alleged harms where he resides and works, that is, in Pennsylvania.[8]  Accordingly, Plaintiff has pled sufficient facts to show that this Court has specific personal jurisdiction over Defendant.

### C.    Plaintiff Has Alleged Claims Upon Which Relief Can Be Granted

As noted previously, Plaintiff alleges in the Complaint claims of libel and defamation per se (Count I) and false light invasion of privacy (Count II).  (See Doc. No. 1-2 at 13-16.)  In the

---

[8]  In Marten, the Third Circuit chose not to "tackle th[e] thorny conceptual issue" of determining where a plaintiff feels the "brunt of the harm" of defamation committed online.  Marten v. Godwin, 499 F.3d 290, 299 n.4 (3d Cir. 2007).  The Circuit noted the possibilities of where a former University of Kansas student taking online classes in Pennsylvania could feel the brunt of defamation harm:

> If the harm is the expulsion, the web-based nature of the educational program makes it difficult to determine the earthbound location of that harm.  If, on the other hand, the harm is the chilling of [plaintiff]'s First Amendment rights, that harm might travel with him or exist in the location in which he exercised his rights (Pennsylvania).

Id.  Here, the thorny analysis has been pruned.  In Marten, the plaintiff's own actions, being his attendance at an online university, muddied the analysis on whether he felt the brunt of his harm in the forum where the online university was located—in Kansas—or where he was located—in Pennsylvania.  However, in this case, the "web-based" concerns involve Defendant's actions, not those of Plaintiff.  Plaintiff is alleging that Defendant's Tweets impugned his professional reputation and caused him emotional distress.  (See Doc. No. 1-2 at 14-15 ¶¶ 55-56, 62.)  The brunt of the harm to Plaintiff therefore will be felt where he professionally practices and teaches, both being in Pennsylvania.  (See id. at 5 ¶ 7.)

Motion to Dismiss, Defendant contends that these claims should be dismissed for several reasons. First, he argues that Plaintiff does not allege sufficient facts to show Defendant published his Tweets with actual malice.  (See Doc. No. 2-1 at 27-29.)  Second, he alleges that his five Tweets do not constitute libel, defamation per se, or false light invasion of privacy because they are based on disclosed, truthful facts.  (See id. at 31-38.)  The Court will first address Defendant's two arguments as applied to Plaintiff's libel claim, and then will turn to his defamation per se and false light invasion of privacy claims.

### 1.    Plaintiff Has Sufficiently Alleged a Claim of Libel

In analyzing whether Plaintiff sufficiently alleges a libel claim upon which relief can be granted, the Court will initially analyze whether the "actual malice" standard applies to Plaintiff. Next, the Court will discuss whether Plaintiff properly pleads a libel claim upon which relief can be granted.

### a.    The Court Need Not Address Whether Defendant Acted with Actual Malice at this Stage

In the Motion to Dismiss, Defendant argues that Plaintiff is a limited-purpose public figure, meaning he must allege that Defendant wrote his purported defamatory Tweets with actual malice. (See Doc. No. 2-1 at 27-29.)  In response, Plaintiff contends he is not a limited-purpose public figure and that it is premature to make this determination without discovery.  (See Doc. No. 8 at 23, 27 n.8.)

The United States Supreme Court has held that when a public official brings a defamation claim, he is required by the First Amendment to allege that the defamatory statement was made with actual malice.  See New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).  Actual malice requires a showing that the purported defamatory statement is made with knowledge that the statement is false or with reckless disregard for whether the statement is false.  See id.  The

Court also has stated that an individual can be a limited-purpose public figure where he or she "voluntarily injects himself [or herself] or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974).

"The question of whether [a] [p]laintiff is a limited-purpose public figure is a . . . difficult and fact-specific [question] . . . not suitable for resolution under Rule 12(b)(6)." Woods Servs. v. Disability Advocates, Inc., No. 18-296, 2018 WL 2134016, at *6 (E.D. Pa. May 9, 2018) (quotation marks and citation omitted). "As a result, courts regularly find that the determination of a litigant's status as a public or private figure should be deferred until summary judgment when a full factual record can be developed." Id.; see also Gillon v. Bernstein, No. 12-04891, 2013 WL 5159625, at *5 (D.N.J. Sept. 12, 2013) ("While the Complaint notes that Gillon has appeared on at least two television programs, . . . the [c]ourt finds it appropriate to defer the public figure inquiry until after the record has been more fully developed through discovery."); Trivedi v. Slawecki, No. 4:11-02390, 2012 WL 5987410, at *3 (M.D. Pa. Nov. 28, 2012) (finding that the question of public figure status "is more appropriately resolved at the summary judgment stage on the basis of record evidence.").

Presently, it would be premature for the Court to determine Plaintiff's status as a limited-purpose public figure without a more complete record. Similar to other trial courts, the Court will reserve the question of whether Plaintiff is a limited-purpose public figure for a later stage of the litigation.

### b.    The Framework of a Libel Claim

In Count I of the Complaint, Plaintiff submits that Defendant's five Tweets constitute libel. (See Doc. No. 1-2 at 13-14.)  To successfully establish a claim of libel under Pennsylvania law,[9] a plaintiff has the burden of proving:

(1) The defamatory character of the communication[;]
(2) Its publication by the defendant[;]
(3) Its application to the plaintiff[;]
(4) The understanding by the recipient of its defamatory meaning[;]
(5) The understanding by the recipient of it as intended to be applied to the plaintiff[;]
(6) Special harm resulting to the plaintiff from its publication[; and]
(7) Abuse of a conditionally privileged occasion.

Joseph v. Scranton Times, L.P., 129 A.3d 404, 424 (Pa. 2015) (quoting 42 Pa.C.S. § 8343(a)).  In a libel action, the court must make a threshold determination of whether a challenged statement is capable of defamatory meaning.  See Gibney v. Fitzgibbon, 547 F. App'x 111, 113 (3d Cir. 2013); see also Byars v. Sch. Dist of Phila., 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013) ("Whether a statement is capable of a defamatory meaning is a question of law for the court.").  "If [it is] not, the claim must be dismissed."  Gibney v. Fitzgibbon, No. 13-7, 2013 WL 1197894, at *3 (E.D. Pa. Mar. 22, 2013), aff'd, 547 F. App'x 111 (3d Cir. 2013); see also Bell v. Mayview State Hosp., 853 A.2d 1058, 1061 (Pa. Super. Ct. 2004) (affirming the dismissal of a complaint where plaintiff's factual averments did not establish defamatory meaning); Richette v. Phila. Magazine, No. 802, 1996 WL 756953, at *2 (Pa. Ct. Com. Pl. Jan. 23, 1996) ("[A] trial court must first determine whether the offending statement, taken in context, would be interpreted by a reasonable reader as defamatory.  If not, the court should dismiss the action.").

---

[9]    Jurisdiction in this case is based on diversity of citizenship jurisdiction.  A federal district court in a case arising under diversity of citizenship jurisdiction applies state substantive law.  See Schmigel v. Uchal, 800 F.3d 113, 119 (3d Cir. 2015).

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 215 (Pa. 1981); see also Mathias v. Carpenter, 587 A.2d 1, 2 (Pa. Super. Ct. 1991) (a court must "determine whether the statement was maliciously written or published and tended to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession") (quotation marks and citation omitted). For Plaintiff to prevail, "[i]t is not enough that [he be] the victim of the 'slings and arrows of outrageous fortune', be embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured his standing in the community of respectable society." Scott-Taylor, Inc. v. Stokes, 229 A.2d 733, 734 (Pa. 1967).

In determining whether a statement is capable of defamatory meaning, a court must view the statement in context. The Pennsylvania Supreme Court has stated:

> [W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, [a court] must consider the full context of the [statement] to determine the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

Tucker v. Philadelphia Daily News, 848 A.2d 113, 124 (Pa. 2004) (quoting Thomas Merton, 442 A.2d at 216).

Moreover, "[i]mportantly, only statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law[,]" and "[i]n order for an opinion to be deemed capable of defamatory meaning under Pennsylvania law, it must reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (quotation marks omitted). The Third Circuit has explained the distinction between actionable and non-actionable opinions as follows:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection"); Krajewski v. Gusoff, 53 A.3d 793, 803 (Pa. Super. Ct. 2012) (dismissing libel claims as to publications that were "matters of opinion" and "neither reported nor implied facts that were 'provably false' . . . ." (quoting Milkovich, 497 U.S. at 20)). Whether a statement is a non-actionable matter of opinion is a question to be resolved by the trial court as a matter of law. See Mzamane, 693 F. Supp. 2d at 481 ("Whether a statement qualifies as a true opinion or an 'opinion' which implies the existence of undisclosed derogatory facts is a question of law to be resolved by the Court"); Balletta v. Spadoni, 47 A.3d 183, 200 (Pa. Commw. Ct. 2012) (dismissing complaint where allegedly defamatory remarks were deemed non-actionable statements of opinion). Finally, although whether a statement is capable of a defamatory meaning is a question of law for a court to decide, a court should dismiss allegations only if it is certain the communications are not susceptible to a defamatory meaning. See Gordon v. Lancaster Osteopathic Hosp. Ass'n, 489 A.2d 1364, 1368 (Pa. Super. 1985).

With these principles in mind, the Court will examine each of the five Tweets.

### c. Defendant's First, Second, Fourth, and Fifth Tweets are Capable of a Defamatory Meaning

As a threshold matter, whether the Tweets have a defamatory meaning is the only element of libel at issue here. Plaintiff alleges that Defendant's Tweets were published on the public

website Twitter, they apply to Plaintiff, and their content and applicability to Plaintiff can be understood.[10]  (See Doc. No. 1-2 at 4, 14 ¶¶ 1-2, 48, 51.)  Further, Plaintiff claims he suffered harm because of the Tweets, and they do not invoke any privilege concerns.[11]  (See id. at 14 ¶¶ 53, 55.)  Thus, the Court need only examine whether the five Tweets have a potential defamatory meaning.

### i.     Defendant's First Tweet

First, on September 15, 2019, Defendant began the chain of Tweets by publishing the first one, which contains a hyperlink to Plaintiff's first *Wall Street Journal* article:



---

[10]  In his third Tweet, Defendant's use of the pronoun "they" as the subject of his sentences.  (See Doc. No. 1-2 at 26.)  This obfuscates whether he is referring to Plaintiff or Penn Medicine more generally.  However, given that the surrounding Tweets all mention Plaintiff by name, it is reasonable that a reader could assume "they" refers to either Plaintiff alone or Penn Medicine acting in conjunction with or through the actions of Plaintiff.  Moreover, Plaintiff's role as Associate Dean of Curriculum during the incident discussed in the third Tweet makes it likely that either he was involved in resolution of the incident or that Plaintiff was alleging his involvement.

[11]  The Supreme Court of Pennsylvania has noted that although 42 Pa.C.S. § 8343(a) requires that "special harm" be proven for libel claims, this term has been interpreted to only require proof of general damages.  See Joseph v. Scranton Times L.P., 129 A.3d 404, 416 (Pa. 2015).

(Doc. No. 1-2 at 25.)

Here, Defendant's first Tweet implies his reliance upon undisclosed facts regarding Penn Medicine's rates of sexual and racial harassment and the content of the February 2016 meeting. (See Doc. No. 8 at 27.) He also does not provide, and Plaintiff's September 2019 article does not contain, context for the class meeting or the LCME Review. Given Defendant's claim in the Tweet that he was present at the lecture, a reader of the Tweet could infer that he was in good position to know undisclosed facts concerning the LCME Review and the February 2016 lecture. (See Doc. No. 1-2 at 25.) Moreover, Defendant's characterization of Plaintiff having "berated [the] class for talking candidly about th[eir] experiences" can be interpreted to be contradictory to the statements reflected in the meeting's transcript. (Id.) Plaintiff explained to the class that his concern was whether students properly categorized their experiences as discrimination and not that students should conceal discrimination. (Id. at 7-8 ¶ 20.) And in closing the meeting, Plaintiff reiterated that Penn Medicine "want[ed] to hear the good things, . . . [and] want[ed] to hear the bad things," and he emphasized the importance of accurate student reporting. (Id. at 9 ¶ 25.) For these reasons, the Court cannot conclude that the statements in Defendant's first Tweet are not susceptible to a defamatory meaning.

### ii.    Defendant's Second Tweet

Next, Defendant continued his thread with his second Tweet:



(Id. at 26.)

Here, similar to the first Tweet, Defendant's second Tweet can be interpreted to misstate Plaintiff's words in the February 2016 lecture. Defendant's assertion that Plaintiff's "message to [the class was] that [they] were too sensitive" implies undisclosed facts about the content of the February 2016 lecture. (Id.) Further, Defendant claims that Plaintiff implored students to "lie about [their] experiences . . . ." (Id.) However, at no point during the lecture did Plaintiff expressly ask students to lie about instances of discrimination. Instead, he asked that students "seriously and carefully" consider whether their individual experiences constituted discrimination so the school could "make sure that [its] current systems work well" and make necessary changes based on accurate reporting. (Id. at 9-10 ¶¶ 23, 25.) He also assured the students that "[w]e want honesty above all else. We want you [to] tell us exactly what you think, but we want you to think hard about what exactly is being asked." (Id. at 8 ¶ 21.) Further, Plaintiff underscored that accurate results would help the school "rip up what we do now and change things. And if we do have a tremendous problem [with discrimination], that's what we should do." (Id. at 9 ¶ 23.)

Given Plaintiff's statements requesting candor from the students to obtain accurate survey results, it cannot be definitively resolved at this stage that Plaintiff urged the Penn Medicine students to lie about instances of discrimination. Whether Plaintiff's speech implied that the students should lie, as Defendant contends, would require credibility determinations and is better suited for resolution at a later point in the case. For these reasons, Defendant's second Tweet is capable of a defamatory meaning.

### iii.    Defendant's Fourth Tweet

To conclude his Tweets on September 15, 2019, Defendant posted his fourth Tweet:



(<u>Id.</u> at 26.)

Again, Defendant's fourth Tweet is capable of a defamatory meaning. Defendant's assertion that Plaintiff "was finally forced out of Penn" is belied by Plaintiff's claim that he is still a Professor of Medicine at Penn Medicine. (<u>Id.</u> at 5 ¶ 7.) Moreover, although Defendant submits that he is merely expressing his opinion of Plaintiff, this cannot be conclusively decided at this stage. Defendant's assertions that he was a former Penn Medicine student and was present during the February 2016 lecture could impart to a reader of the Tweet that undisclosed facts bolster his claim that Plaintiff "seek[s] to hide abuse and protect abusers." (<u>Id.</u> at 26.) Thus, the Court cannot conclude that the fourth Tweet is not susceptible to a defamatory meaning.

### iv.    Defendant's Fifth Tweet

Finally, on April 14, 2020, in response to Plaintiff's second *Wall Street Journal* article, Defendant published the fifth Tweet, which continued the thread of his prior four Tweets:



(Id. at 32.)  Similar to the prior Tweets, Defendant's purported opinion of Plaintiff being someone who "actively trie[s] to suppress reporting of sexual and racial harassment" implies the existence of undisclosed facts underlying his opinion.  (Id.)  Therefore, for the same reasons discussed above, the Court cannot conclude that the fifth Tweet is not capable of a defamatory meaning.

### d. Defendant's Third Tweet is Not Capable of a Defamatory Meaning

Unlike the other four Tweets discussed above, Defendant's third Tweet is not capable of a defamatory meaning.  On September 15, 2019, Defendant continued his thread with his third Tweet:



(Id. at 26.)

Here, Defendant describes an instance of sexual harassment at Penn Medicine.  (See id.)  Unlike the prior Tweets, Plaintiff has not substantively challenged the Tweet's accuracy, referring to it as "the unfortunate harassment incident . . . ."  (Id. at 12 ¶ 41.)  Thus, the Tweet's contents are presumed to be true, and it does not contain Defendant's opinion.  Because the Tweet is not an opinion, it does not present the same concerns of the existence of undisclosed facts contained in the prior four Tweets.  Thus, it is not susceptible to a potential defamatory meaning.

### 2. Plaintiff Has Sufficiently Alleged a Claim of Defamation Per Se

In Count I of the Complaint, Plaintiff alleges a claim of defamation per se against Defendant.  "Defamation per se can be either 'words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct.'"  Synygy, Inc. v. Scott-Levin,

Inc., 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999) (quoting Clemente v. Espinosa, 749 F. Supp. 672, 677 (E.D. Pa. 1990)).  An accusation of business misconduct is one that "ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business."  Id. at 677-78 (quoting Restatement (Second) of Torts § 573 (1977)).

Here, in viewing the allegations in a light most favorable to Plaintiff, Defendant's Tweets can be construed as imputing business misconduct.[12]  Primarily, Defendant writes that Plaintiff "is part of a noxious group of physicians who seek to hide abuse and protect abusers."  (Doc. No. 1-2 at 26.)  These words can be viewed as questioning his fitness to practice medicine.  Further, Defendant's remaining allegations can be interpreted as disputing Plaintiff's fitness to serve in academia.  (See id.)  For these reasons, Plaintiff has pled a claim of defamation per se.

---

[12] Defendant's Tweets cannot be construed as accusing Plaintiff of having a loathsome disease or engaging in a criminal offense.  See Clemente v. Espinosa, 749 F. Supp. 672, 679 (E.D. Pa. 1990) (defining engaging in a criminal offense as "charg[ing] either directly or indirectly the commission of a specific offense punishable by imprisonment. . . .  [A] charge of affiliation with criminal elements alone is not [defamation] per se.").

It is less clear whether Defendant's assertions that Plaintiff condoned serious sexual misconduct is defamation per se.  The Restatement (Second) of Torts provides the following with regard to "serious sexual misconduct":

> The rule stated in this Section has been generally applied to any statement that imputes any form of unchastity to a woman, married or single, irrespective of whether the conduct charged constitutes a criminal offense.  The rule applies to a statement charging a woman with specific acts of adultery, fornication or any other form of sexual intercourse with a man other than her husband, as well as to general charges of unchaste conduct.  It does not apply to mere imputations of immodesty that do not imply unchaste conduct.

Restatement (Second) of Torts § 574 (1977).  In his Tweets, Defendant does not claim that Plaintiff engaged in serious sexual misconduct, but that he condoned and "protected" others who did.  (Doc. No. 1-2 at 26.)  The Restatement definition is silent on whether an allegation of condoning, but not engaging in, serious sexual misconduct constitutes defamation per se.  For this reason, Plaintiff has not alleged that Defendant charged him with serious sexual misconduct sufficient to support that category of defamation per se.

### 3. Plaintiff Has Sufficiently Alleged a Claim of False Light Invasion of Privacy

Finally, in Count II of the Complaint, Plaintiff alleges a claim of false light invasion of privacy against Defendant. In the Motion to Dismiss, Defendant contends that this claim should fail for the same reasons as Plaintiff's libel claim: because he has not plausibly pled actual malice and Defendant's claims in the five Tweets are true. (See Doc. No. 2-1 at 37-38.) Similarly, Plaintiff submits that it is improper for the Court to make an actual malice determination at the motion to dismiss stage, and that the Tweets can be construed to have a defamatory meaning. (See Doc. No. 8 at 31-32.)

Pennsylvania recognizes that publicity which places a person in a false light is a viable cause of action. See Graboff v. Colleran Firm, No. 10-1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013), aff'd, 744 F.3d 128 (3d Cir. 2014) (citing Fanelle v. LoJack Corp., 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000)). To plead a claim for false light under Pennsylvania law, a plaintiff must allege facts showing that the published material "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity." Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014). Specifically, "[a] plaintiff can establish falsity by showing that a defendant 'selectively printed or broadcast true statements or pictures in a manner which created a false impression.'" Id. (quoting Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181, 1189 (Pa. Super. Ct. 1988)). Even if "a publication is literally true, 'discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed.'" Id. (quoting Larsen, 543 A.2d at 1189). "Ultimately, whether the communication is capable of bearing a particular meaning which is highly offensive to a reasonable person is a question for the Court." Savely v. MTV Music Television, No. 11-1021, 2011 WL 2923691, at *5 (D.N.J. July 18, 2011)

(internal quotations omitted). Finally, the "actual malice" standard for defamation of public figures also applies to claims of false light. See Coughlin v. Westinghouse Broad. & Cable, Inc., 603 F. Supp 377, 389 (E.D. Pa. 1985) (holding that failure to plead actual malice "require[d] . . . grant[ing] summary judgment as to plaintiff's false light claim.").

Accepting Plaintiff's allegations as true, he has sufficiently pled a claim of false light. And as discussed in Section IV.C.1.a, supra, it would be premature for the Court to determine whether Plaintiff has sufficiently pled actual malice at this stage of the litigation. Moreover, Defendant's argument that the veracity of the five Tweets shields them from supporting a false light cause of action falls short. Even accepting, arguendo, that the Tweets contain only true information, the "discrete presentation" with which Defendant provided information on the LCME Review and the February 2016 lecture give rise to a "susceptible inference" of presenting Plaintiff in a false light. See Graboff, 2013 WL 1286662, at *16.

Additionally, even though the third Tweet is not susceptible to a defamatory meaning, it is capable of presenting Plaintiff in a false light. As noted above, Plaintiff has not challenged the veracity of the third Tweet; however, a true statement can constitute a claim of false light if it is broadcast in a way that creates a false impression. See Graboff, 744 F.3d at 136. Given the severity of the content in the third Tweet, which discusses a doctor sexually harassing a student, and the context of the Tweet, which was surrounded by other Tweets about Plaintiff, the third Tweet can present a false impression of Plaintiff. For all these reasons, Plaintiff has sufficiently pled a claim of false light invasion of privacy.

## V. CONCLUSION

For the foregoing reasons, the Motion to Dismiss (Doc. No. 2) will be denied as to Plaintiff's libel claim, with the exception of Defendant's third Tweet, and will be denied regarding

the defamation _per_ _se_ and false light claims.  The Motion to Remand (Doc. No. 10) also will be denied.  An appropriate Order follows.